UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
**PROCAPUI-Productores de Camaroes de Icapui Ltda.,**

                      Plaintiffs,

    -against-                                      **Case No.**
                                                07 Civ. 6627 (BSJ, AJP)

**MARCIAL GERALD LAYANI, G.F. HIGGINS
INC., THERESA HIGGINS as Executrix of
THE ESTATE OF GERALD FRANCIS HIGGINS,
THOMAS HIGGINS, ROBERT HIGGINS,
RICHARD RUBIN and NOEL BLACKMAN**

                               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### DECLARATION OF JOZEF ANAVIAN

      **JOZEF ANAVIAN**, declares the following under penalty of perjury, under the laws of the United States:

      1. I am currently in charge of the affairs of plaintiff pursuant to and under the laws of the Republic of Brazil. I submit this declaration in opposition to the motion of the Higgins defendants ("Movants") for dismissal of this action and other ancillary relief and in support of plaintiff's motion for a stay of the New York State action, further described below, and ancillary relief. I am fully familiar with the facts herein.

      2. Movants have challenged the Complaint. The remaining defendants have not yet appeared.[1]

      3. During 1999, my nephew, Marcial Gerald Layani ("Layani"), approached my sister

---

[1] Copies of the Summons and Complaint together with Requests for Waiver of Service and the requisite return documents and the rules of Judge Jones and Magistrate Judge Peck were sent to all defendants on July 24, 2007. To date, only G.F. Higgins, Inc., Thomas Higgins, Robert Higgins and The Estate of Gerald Francis Higgins have appeared.

and I with a plan to start a business for the importation of shrimp and lobster from Brazil. We agreed to enter into the venture with him and caused Richard Rubin, then Layani's attorney, to form RIMIJO International Trading Corp ("RIMIJO")[2]. We did not know that approximately one year earlier Layani, acting through Rubin and others, had formed Interbras Global Trading Co., Ltd. ("Interbras"). We were also unaware that some year prior, the same persons, to wit: Layani, Rubin and Blackman, had also formed MC Holdings Corp. ("MC").

4. We placed Layani in charge of the affairs of RIMIJO and he undertook virtually the entire management of the company. Also during 1999, Layani approached us with the idea of investing further funds in Brazil for the creation of a shrimp farm which would raise farm shrimp for sale thereby eliminating the need for RIMIJO to acquire its shrimp in the open market. I agreed to the venture and in furtherance Layani formed PROCAPUI-Productores de Camaroes de Icapui Ltda., ("Procapui") in Brazil. Layani then went to Brazil and attended to the affairs and management of Procapui. Both my sister and I remained in New York as our businesses were located here.

5. Throughout the years 1999 through 2004 we were confident that Layani was attending to the affairs of Procapui with responsibility and we continued to attend to our businesses in New York. In fact, I was so confident of that fact that in September, 2002 Procapui entered into an agreement with G.F. Higgins, Inc. and I guaranteed that Agreement and gave a mortgage in the amount of $750,000 on my home in New York as security therefor. However, commencing in 2004 I began to become suspicious regarding the affairs of Procapui and went to Brazil to ascertain what was happening and whether or not the business was being run as it should have been.

6. When I arrived, Layani made every effort to insulate me in every way from the affairs of the company constantly assuring me that all was well and that the company was profitable and being managed responsibly. In addition, as I had previously purchased a home in Brazil, the Higgins family frequently visited my home and also avoided speaking to me about the company's

---

[2] **Ri**ta, **Mi**chael (Layani) and **Jo**zef.

business other than to assure me that all was well. However in late 2004 to early 2005, I began to hear and see things which indicated that that was not the case and I began to make further inquiries regarding the affairs of Procapui. I learned that the company was being run from the offices of Eunice Oliveira, a Brazilian attorney retained by Layani, and that all of the books and records of the company were in her offices. I also learned that the company had also retained another lawyer, Atilio Paracampos. As further discussed below, both Oliveira and Paracampos have been charged with felonies regarding their conduct of the affairs of Procapui and have been disbarred.

7. My efforts to obtain access to the records of Procapui from either Oliveira or Paracampos were futile and I later learned that, in the dark of night, all of the corporate records were either removed or destroyed. I later learned that many of them were removed by Layani and taken to an undisclosed location in Santos, Brazil. At this point, I decided to stay in Brazil for an extended period of time and ascertain the status of my company.

8. Not having access to any corporate records and unable to commence work to ascertain what the company had been doing, I learned the status of Procapui in a most unique way. I was constantly being sued by creditors, employees, suppliers and other claimants against Procapui who were making claims against me by virtue of my shareholder status in the company. In fact, no fewer than 55 lawsuits were commenced against me and Procapui. As a result of these lawsuits, I began to come into possession of documents which bore on the affairs of Procapui. I learned, through these lawsuits and documents, that Procapui had not paid any taxes, had not paid employees, had allowed creditors and suppliers to the shrimp farm go unpaid to the extent that they removed their products and equipment, violated the exchange laws of the Republic of Brazil, engaged in the export of illegal lobster under the laws of Brazil and may well have been engaged in illegal drug trafficking. Not being a resident of Brazil and not speaking the Portugese language I was ill prepared to address these claims, lawsuits and allegations and was fortunate enough to retain Alberto Carapeba, a Brazilian lawyer, who immediately set to work to assist me in determining what was true and what was untrue. In the interim, my nephew, Layani, abandoned the affairs of Procapui, left Fortaleza, Brazil and moved to Santos, Brazil some 600

miles distant where he apparently started another business doing the same thing and apparently run in the same fashion.

9. In defense of the various lawsuits and claims, I began to literally sift through whatever documents I could obtain either through third-parties or through Carapeba and began to reconstruct, to the extent possible, the affairs of Procapui. I will deal with each of those activities, discovered to date, in chronological order below:

10. Apparently, commencing in 2000, G.F. Higgins, Inc.[3] started to purchase merchandise through Layani. The first purchases were made though an entity in Brazil called Waxtrade as Procapui was not yet ready. Apparently, only one purchase was made in the year 2000. In 2001, G.F. Higgins started purchasing from Procapui in earnest. However, during that year, G.F. Higgins also purchased from Procapui through Waxtrade. Annexed hereto (Exhibit 1) is a report of the invoices which were produced by G.F. Higgins, Inc. in the New York State action during the year 2007. The "official" invoices which were sent to G.F. Higgins by Procapui were sent in conjunction with the shipments and were accompanied by all of the documents necessary for exportation from Brazil and importation into the US. A representative sample of a "real" Procapui invoice is annexed (Exhibit 2). However, during the New York State action, I learned that G.F. Higgins also received a series of 44 invoices, discovered to date, which were marked with the suffix "T" and which were for the same shipments as Procapui's "real" invoices [See Exhibit 1, T invoices]. Neither Procapui nor the Central Bank of Brazil, through which all exports must be made, had absolutely any record of these invoices. They were apparently faxed to G.F. Higgins and did not accompany the shipments, were not sent to G.F. Higgins' import broker and differed materially with the "real" Procapui invoices.

11. In late 2005, G.F. Higgins, Inc. commenced an action in the Supreme Court of the State of New York, County of New York entitled ***G.F. Higgins v. Procapui Productores De Camaroes De Icapui Ltda and Jozef Anavian*** in which it alleged that Procapui was indebted to

---

[3] I was not aware of the amount of sale to Higgins or the dates of each until discovery in the New York State action as the records of Procapui regarding those sales were either secreted or destroyed.

it in the amount of approximately $1.3 million and that I as guarantor was responsible for that debt. G.F. Higgins proceeded by motion for summary judgment in lieu of complaint alleging that the claim was on an account stated. In furtherance of that allegation, G.F. Higgins contrived to obtain a statement dated June 3, 2004 (Exhibit 3) from Layani attesting to the alleged debt due it from Procapui. Of course, that statement was requested by Higgins and sent by Layani without either the knowledge or consent of either me or Procapui. Interestingly, that action was supported by a schedule prepared by Higgins (Exhibit 4) which started with a balance of $706,639 allegedly due as at October 31, 2002 and listed payments and shipments without ever mentioning the "T" invoices nor to whom the payments were actually sent.

12. This was the first notice that I received or that Procapui received that it was allegedly in debt to G.F. Higgins. In fact, in June, 24, 2005, I had obtained a statement from Layani that the Higgins relationship was entirely fraudulent. He stated[4]:

> I, Marcial Gerald Layani, do make the following declarations.
> On June 29";2004 (sic.) I have declared that I personally have diverted funds, profits and capital, from Procapui Ltda, Brasil. This process was partially done with the help of shareholder officers of G.F.Higgins Pembroke U.S.A. Specifically Gerry Higgins and Thomas Higgins.
> Our official invoices for shipments of lobsters and shrimps from Procapui Ltda Brasil; were approximately 20-50% less than actual real value of "same day price" of the"same type of goods". This extra 20-50% was shared between Higgins and myself, Marcial Gerald Layani.
> Thomas Higgins has full knowledge of this fact. Plus the facts such as, we were shipping illegal size lobsters (sizes 2 & 3) from Brazil. (the shared profits were very high on these illegal lobsters).And also both Thomas and Gerry Higgins were well aware that the money send (sic.) to various accounts-other than Procapui Ltda, in Brazil-;were for our mutual benefits and for our illegal activities. And the money send (sic.) had absolutely nothing to do with Procapui Ltda., and with personal guarantee of Jozef Anavian.
> As a matter of record, G.F. Higgins owes Procapui Ltda.. Brasil, over $1,000,000.00 for the actual shipments. Plus he owes Procapui Ltda ., and its shareholders one half of all the illegitimate discounts that they have received.
> All these were done with total secrecy from the shareholders of Procapui Ltda., shareholders .None of the members of my family or the

---

[4]This statement was made before an official of the Republic of Brazil and is a sworn statement which, under the laws of Brazil, given to such an official is self-sponsoring. It is the responsibility of the official taking the statement to assure that the statements is freely and accurately given and that the testimony therein subscribed is true and accurate.

shareholders of Procapui Ltda., were aware of any of these illegal activities.

Witnesses

13. Nevertheless, upon review of the schedule submitted by Higgins [See Exhibit 4], I was unable to match the amount of the invoices claimed with any records of Procapui and I was unable to see any record of the sums allegedly sent.  Not having a full record of the invoices, I requested Mr.  Carapeba to inquire of the Central Bank of Brazil regarding its records concerning the G.F. Higgins account with Procapui.  I obtained an accounting dated November 21, 2005 from the Central Bank a certified copy of which is annexed (Exhibit 5) that there was owing **to Procapui** the sum of $1,420,681.  It became apparent from the Higgins statement of payments sent against the Central Bank records that either Higgins was lying about the payments or, as was later confirmed, G.F. Higgins had not remitted to Procapui but, in fact, to third parties in complete derogation of each and every invoice which Procapui sent to it.  Annexed hereto (Exhibit 6) is a representative sample of a Procapui export document designating the payee bank as Bank of Boston in Brazil, which is an agent Bank approved by the Central Bank of Brazil to receive payments for exports.  One of these documents accompanied each and every "real" Procapui invoice.  Payment to an authorized Bank is an absolute requirement of both Brazilian and US law in this area.

14. Obviously, this raised the question of (1) either G.F. Higgins was lying about having made the payments or (2) they were sent elsewhere.  In furtherance of that inquiry, we did not become aware of where and to whom G.F. Higgins sent the payments until discovery in the New York State action.  It has now been discovered that Higgins sent substantial payments to Star Financing.  Annexed hereto (Exhibit 7) is a report of Higgins payments and to whom.  Interestingly, Higgins was making payments to Star Financing and Tansy, SA.  Both Star and Tansy are entities which engaged in money laundering and exchange control avoidance and both are currently under investigation by the governments of both Brazil and the US.  In fact, Higgins made payments to Star Financing sporadically from 2001.  However, in or about 2002 Higgins began making an extraordinary number of transfers to Star and in 2003 each and every transfer made by Higgins was to Tansy.

15. Were the above not enough, since the middle of the relationship or approximately 2002-2003, Layani would request me and my friends and members of our family to make "loans" to Higgins, advising us that Higgins needed money and that the loans were for the purpose of continuing the relationship. We have since learned that these payments were made solely for the purpose of defrauding Higgins' bank. Apparently, in order to make the payments to Procapui, Higgins negotiated a line of credit with its Bank in Massachusetts. The line required Higgins to show certain balances at the end month and at the end of each quarter (Exhibit 8) . We surmise[5] from the facts that we have now learned that we were requested to remit funds to Higgins at or near the end of each month or quarter which Higgins returned to us immediately thereafter. Apparently, the purpose of these "payments" was to convince Higgins' bank that the arrangement between Higgins and Procapui was other than that which it really was.

16. Procapui has not yet had a complete accounting of the funds which Higgins alleges to have sent to Procapui or, according to Higgins to third parties on behalf of Procapui. In fact, during the New York State[6] court proceeding, Higgins admitted to having made a "mistake" of approximately $100,000.

17. Armed with the above, most of which was learned through the New York State action, my counsel inquired of both Thomas and Robert Higgins why G.F. Higgins had received no fewer than 44 "T" invoices which apparently duplicated, except as to amount, the "real" invoices. They responded that they had made an inquiry of Layani and never received an answer!

18. This Court need not, however, rely upon the fruits of my investigation nor that which I made on behalf of Procapui. Given the manner in which the business of Procapui was conducted the CPI, Parliamentary Inquiry Commission[7], of the Republic of Brazil has conducted its own exhaustive inquiry and investigation into the affairs of Procapui, Higgins, Star Financing, Tansy, S.A., Paracampos and Oliveira. It has concluded in its Final Report that Layani was guilty of

---

[5]No discovery has yet been taken of Higgins' bank.

[6]Discovery in the NY Court proceeding was limited to my deposition and that of Thomas and Robert Higgins.

[7]The body is the highest investigatory authority of the Republic of Brazil.

numerous related offenses, Oliviera and Paracampos should be disbarred, Procapui had sold illegal lobsters to G.F. Higgins and exported them in contravention of Brazilian law, that many of the exports might have been accompanied by drugs and that G.F. Higgins had failed to pay for the shipments made. A copy of excerpts of the CPI report of the Government of Brazil is annexed hereto (Exhibit 9).

19. Throughout 2005, I attempted to ascertain the status of Procapui in earnest. My efforts were met with obfuscation of all the corporate records and when I confronted Layani demanding an explanation of what had happened, I was told that he could not give me the information by reason of the fact that he was afraid for his life and health having received threats that exposure of the activities would result in injury or death to Layani, me and members of my family. In desperation, I dispatched Layani's mother to him to try and get to the bottom of this and she had the same experiences. I reached out for the accountant for Procapui who acted for the company during the period in question who also advised that he had been threatened.

20. Finally, we were able to have Layani set forth what his scheme had been with G.F. Higgins, Thomas Higgins, Robert Higgins, Rubin and Blackman and we obtained the confession annexed to the Complaint herein [Exhibit D to Complaint].

21. Since that date I have had virtually no communication whatsoever from or with Layani. If fact, it appears that he has maintained a relationship with Rubin and Higgins but not with me. The relationship with Higgins is evident from the affidavit submitted on this motion which he sent to Higgins' counsel. In point of fact, Layani is now in Toulouse, France. He is not a resident of Brazil and never has been. He is currently a fugitive from Brazil as a result of the CPI report and the indictments which have flowed therefrom. I know that he has maintained a relationship with Rubin solely from the fact that I have a friend who is a lawyer in Toulouse, France. He requested Layani to visit him and attempted to give him the Summons and Complaint herein but was informed that Layani would not accept it having already received a copy of it from both Rubin and Higgins. Layani's last official residence was in New York and, to my knowledge, that is still his residence.

22. It has also been discovered that apparently the relationship between Layani and Movants was never an honest one. Apparently, Layani concocted some form of a scheme to borrow money from a Brazilian bank ostensibly for the purpose of obtaining financing for the shrimp farm. It is apparent that the shrimp farm would never have seen the proceeds of any such financing. In furtherance of the scheme, Layani sent an e-mail to Higgins requesting that Higgins send him a fictitious purchase order which Layani would then use to convince the Brazilian bank that Procapui was stronger than it actually was. A copy of that e-mail is annexed (Exhibit 10). Interestingly, Layani was candid with Higgins stating in the e-mail:

> This all fictice (sic) it is for our bank. we are trying to get a loan for the
> farm and we have to show that we have a strong market.
> I will talk to you during the day and to Bobby.

Interestingly, Procapui had no record of any response to this e-mail until discovery in the State action. Movants produced their response (Exhibit 11)

> To whom it may concern:
> G.F. Higgins has a pre existing relationship with the principals of IMA Ltd. We have been purchasing shrimp and lobster from them for several years under a private label program.
>
> We have an agreement to buy all production of shrimp (400t) and lobster from IMA Ltd at a mutually beneficial price based on current market conditions. G.F. Higgins has the financing available to purchase this shrimp and lobster from IMA, Ltd.
>
> **Our relationship with IMA Ltd is exclusive, we do not purchase any product from Brazil other than what we buy from IMA Ltd. This amount, to date, has only been limited by the amount of product that IMA Ltd can supply**.
>
> I hope this short letter has been helpful.Thomas Higgins, President
> (emphasis added)

In fact, G.F. Higgins, to my knowledge never had any relationship with IMA Ltd. There is not a single invoice between Higgins and IMA. There was no agreement to purchase shrimp and lobster from IMA. Furthermore, Higgins never had any "exclusive" relationship with IMA nor, in fact, any relationship at all. Higgins never purchased a single pound of product from IMA and

IMA. In short, this letter is totally false, sent solely for the purpose of defrauding a Brazilian bank and in furtherance of some scheme as yet undisclosed between Layani and Higgins.

23. Nevertheless, in the face of the above Higgins has the temerity to suggest that they are unaware of what is being alleged against them, are totally in the dark as to their own involvement, have absolutely no idea why they received at least 45 duplicate, false, "T" invoices, have no idea why Procapui is complaining regarding having its money sent to third-parties and money launderers and not to Procapui registered accounts as set forth on each and every Bill of Lading sent to Higgins. Of course, in furtherance of this, Higgins would also have Procapui the confession of its own then President that this was all in furtherance of a "kickback" scheme involving illegal and fraudulent payments to Higgins, sale of illegal lobster and invoices which were well below each and every industry established market.

WHEREFORE, It is respectfully requested that movants' motion be in all respects denied.

Dated:

September 14, 2007

_____
Jozef Anavian