**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
**PROCAPUI-Productores de Camaroes de Icapui Ltda.,**

                                 Plaintiffs,

        **-against-**                               **Case No.**
                                                    07 Civ.  6627 (BSJ, AJP)


**MARCIAL GERALD LAYANI, G.F. HIGGINS**
**INC.,  THERESA HIGGINS as Executrix of**
**THE ESTATE OF GERALD FRANCIS HIGGINS,**
**THOMAS HIGGINS, ROBERT HIGGINS,**
**RICHARD RUBIN and NOEL BLACKMAN**

                                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

### MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF THE HIGGINS DEFENDANTS TO DISMISS

#### Preliminary Statement

       This Memorandum is submitted in opposition to the motion of the Higgins defendants to dismiss the Complaint herein.


#### STATUS OF THIS ACTION

       To date, though the Summons and Complaint were sent to all defendants on July 26, 2007, only G.F. Higgins, Inc., Thomas Higgins, Robert Higgins and Theresa Higgins ("the Higgins defendants") have appeared.  Counsel for Richard Rubin has communicated with counsel for plaintiff but has not yet appeared.  Noel Blackman has refused to appear.  Marcial Layani, refused service by counsel in Toulouse, France but admitted having received the Summons and Complaint from both Higgins and Rubin.

## THE NEW YORK STATE ACTION

G.F. Higgins, Inc. commenced an action before the Supreme Court of the State of New York, County of New York seeking judgment against plaintiff ("Procapui") and Jozef Anavian. The gravamen of the action was an alleged "account stated" between G.F. Higgins, Inc. and Procapui wherein Higgins claimed approximately $1.3 million and claimed against Anavian on a guaranty executed by him on behalf of Procapui.

Since the State action, given the facts herein, was anything but an "account stated" action the proceeding languished for more than a year with various conferences the purpose of which was to in effect withdraw the CPLR 3213 motion and proceed with the matter on the merits.

In the Fall, 2006 all of the parties to the State action appointed new counsel who are present counsel for plaintiff and the Higgins defendants herein. At that time, counsel discussed the contemplated Federal Action and agreed to conduct limited discovery in the State action as that action was then pending, the facts had not yet been fully developed, the State action was otherwise in limbo and the parties were available for depositions. Accordingly, depositions proceeded in the State action limited to Jozef Anavian and the two individual Higgins defendants herein. Given the State Court's pre-trial order Higgins filed a Note of Issue on July 31, 2007 and this action was commenced a week prior thereto.

Clearly, the only issue presently before the State Court is Higgins claim for an "account stated" and the Anavian guaranty.[1]

## THE COMPLAINT HEREIN SPECIFIES THE CLAIMS FOR RELIEF WITH SUFFICIENT PARTICULARITY

Citing this Court to several purported authorities for the proposition that F.R.Civ.P. standards apply to actions brought under RICO, the Higgins defendants argue that the Complaint

---

[1]Since the CPLR 3213 motion was denied the affidavits submitted therein became the pleading in said action

herein fails to meet that standard.  Movants cite this Court to *Farlow v. Peat, Marwick, Mitchell & Co., 956 F.2d 982 (Cir., 1992)* and to *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co., 940 F.Supp. 1101 (W.D.Mich.,1996)* for support.  Interestingly, the Court in *Farlow* sustained the lower courts dismissal of an "Amended Complaint" after plaintiff therein specifically ignored a previous order setting forth the trial's courts requirements for content of the Amended Complaint finding that plaintiffs therein, even in their Amended Complaint not only, ignored the prior order but included no specificity whatsoever regarding the claims alleged . The Court in *Farlow* noted:

> The complaint fails to make any specific allegation that Peat Marwick participated in Powers' misrepresentations-the claim is that Peat Marwick knew "at the time PMM certified" the Pepco statements that Powers intended to provide them to prospective investors. However in this respect, the only particular partnership memorandum alleged to include Pepco financial statements was the memo for the Southroads Mall Village partnership, which contained only the statement for December 31, 1981. Some newsletters (not identified) were sent to investors (not identified) after they had invested and the complaint alleges that a July 12, 1982, newsletter included a financial statement for year-end 1981. It is claimed that these newsletters "induced" future investments, but no specific facts are provided concerning what these future investments might have been, who made them, or what newsletters contained information concerning these investments. The complaint charges that Powers, with Peat Marwick's knowledge and consent, sent copies of financial reports to prospective investors; but, again, no facts are alleged indicating which financial statements were sent to whom or in what context.
>
> In the December 10, 1986 dismissal order, Judge Russell ruled that plaintiffs must specify which financial statements appeared in which offering circular and what was fraudulent about those statements. In the Second Amended Complaint, plaintiffs identified only one offering circular, for Southroads Mall Village, which contained Pepco financial statements, but they did not allege any specific problem with those financial statements. Judge Phillips found that the redrafted allegations of the Second Amended Complaint did not satisfy the requirements of Rule 9(b) and dismissed the *986 complaint with prejudice. In particular it was noted that plaintiffs claimed defects in only the 1982 and 1983 statements but not with respect to any 1981 statement.

Even more inapposite, the Court in *Picard* found that the Complaint was based almost entirely on alleged actions of third-parties.

Under this backdrop we may examine the allegations of the Complaint herein. As only the Higgins defendants are moving, we need only examine the Complaint as it applies to them. The Complaint herein alleges as follows:

30. **In or about 2000**, Layani and Blackman and, upon information and belief, Miceli and Rubin, acting in concert, introduced Procapui to G.F. Higgins. Inc. ostensibly for the purpose of selling lobster and shrimp to G.F. Higgins, Inc.

31. Anavian and Zahabian were informed that the relationship between Procapui and G.F. Higgins was arms length.

32. In fact, the relationship was a contrivance among Layani and Blackman, G.F. Higgins, Gerald Higgins and Thomas Higgins, and, upon information and belief, Rubin, acting in concert, to illegally and fraudulently further divert the assets and profits of Procapui to themselves.

33. In furtherance of said scheme, Layani and Blackman, G.F. Higgins, Gerald Francis Higgins, Thomas Higgins and Robert Higgins, and, upon information and belief, Rubin, acting in concert, using the mails and the wires, entered into agreements which were not in the interests of Procapui.

34. In furtherance of said scheme, and without the knowledge or consent of either Anavian or Zahabian; Layani, Rubin, Miceli, G.F. Higgins, Gerald Higgins and Thomas Higgins, using the mails and the wires, acting in concert:

a. caused Procapui to enter into contracts or agreements with MC Holdings and Interbras which were not in the interests of Procapui, and which were intended solely to use the mails and the wires to divert the assets and profits of Procapui, and

b. using the mails and the wires, sold the merchandise of Procapui through Interbras and MC Holdings retaining in said corporations the profits which were actually those of Procapui, and

c. using the mails and the wires, transferred monies and assets of Procapui to Interbras and MC Holdings with either no or inadequate consideration, and

d. using the mails and the wires, seized and converted the corporate opportunities of Procapui and transferred those

4

opportunities to Interbras and MC Holdings, and

e. using the mails and the wires, diverted funds which were due to Procapui from its customers to private and/or personal accounts of Layani, Rubin and Miceli in total derogation of the rights of Procapui in said accounts receivable and

f. contrived to cause the merchandise of Procapui to be sold to Higgins for discounts so substantial that Procapui was not able to make a profit therefrom, and

g. diverted the proceeds of those discounts away from Procapui and its shareholders in the form of illegal "kickbacks" to G.F. Higgins, Gerald Higgins, Thomas Higgins, Robert Higgins, Layani, Rubin and Blackman, and

h. diverted payments due to Procapui from Procapui and into the private and personal accounts of G.F. Higgins, Gerald Higgins, Thomas Higgins, Layani, Rubin and Blackman, and

i. altered the books and records of Procapui to erase, reduce, eliminate or otherwise obfuscate accounts due and receivable to Procapui from G.F. Higgins, Inc., and

j. made payments to Procapui through illegal and unauthorized intermediaries, contrary to the laws of Brazil and of the United States which then further diverted the proceeds of those payments away from Procapui and to G.F. Higgins, Gerald Higgins, Thomas Higgins, Robert Higgins, Layani, Rubin and Blackman, and

k. contrived to have Procapui engage in the unlawful sale of lobster which did not conform the legal lobster either under the laws of the United States or those of Brazil.

35. In furtherance of this continuing scheme, G.F. Higgins, Layani, Thomas Higgins, Robert Higgins and Gerald Higgins, acting in concert with Layani, contrived to cause Procapui to enter into a "working capital" and "line of credit" agreement whereby G.F. Higgins was to advance funds to Procapui and be repaid either in cash or in merchandise delivered to it by Procapui

*     *     *

.

40. **For a continuous period from in or about 2000 through the end of the relationship in or about early 2005**, Layani, G.F. Higgins, Gerald Higgins, Thomas Higgins and Robert Higgins contrived to defraud Procapui and embezzle its assets and profits and transfer those assets and profits to themselves.(emphasis added)

With regard to the specific acts of racketeering the Complaint alleges:

**Racketeering Act One**: (extortion)

49. Plaintiff repeats and realleges paragraphs 1 through 48 hereof.

50. **In or about 2004,  and for a continuous period thereafter,** Layani. acting in concert with, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins threatened and coerced plaintiffs advising them that any attempt to redress or correct the acts complained of would result in the death of Anavian or members of his immediate family (Exhibit A).

51. **In or about 2004, and for a continuous period thereafter**, **Layani  threatened and coerced Anavian, advising him that any attempt to redress the grievances of plaintiff or to report the activities complained of to the authorities of either the United States or the Republic of Brazil would result in the death of Anavian or members of his immediate family** (Exhibits A and  B).

52. In conjunction therewith, Layani and persons acting in concert with him or at his direction are currently under investigation by the government of Brazil for charges of murder, extortion, illegal sale of shrimp and lobster, drug trafficking, prostitution, child molestation and other assorted violations of the laws of the Republic of Brazil.(emphasis added)

The Complaint also sets forth the dates, times, participants and nature of the alleged racketeering acts, as follows:

**Racketeering Act Two**: (mail fraud)

54. Plaintiff repeats and realleges paragraphs 1 through 48 hereof.

55. **Commencing in or about 2001 until late 2004**,  Layani, acting in concert with, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins engaged in a pattern of using the mails to **transmit doctored and altered invoices** of Procapui to G.F. Higgins

6

allegedly representing the sale of goods by Procapui to G.F. Higgins.

56.  In reality, the invoices transmitted were mere alterations of the accurate invoices which represented the sale price of the goods sold and delivered.

57.  **The bogus invoices were for a different amount and were issued without the knowledge and or consent of either Procapui or the Brazilian import/export authorities and without the knowledge of consent of the United States import authorities**. (Exhibit C[2])

58.  **In addition, defendants contrived to cause the bogus invoices to not include instructions to G.F. Higgins to remit payment to the Republic of Brazil approved bank of Procapui for the receipt of payment for goods sold, delivered and exported from the Republic of Brazil in accordance with the exchange control and import/export laws of the Republic of Brazil**.

59.  Layani, acting in concert with, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins **engaged in a pattern of using the mails for the purpose of receiving these invoices, with full knowledge that they were false and fraudulent, and diverting the sums due thereon from Procapui to third parties known only to Layani, acting in concert with, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins.**

60.  In furtherance of this scheme, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins contrived to have an **uninterrupted series of invoices spanning the period from 2001 through 2004 issued from Procapui to G.F. Higgins which did not reflect the fair value of the goods sold and delivered by Procapui to G.F. Higgins.**

61.  In furtherance of this scheme, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins, acting in concert, using the mails, **caused an uninterrupted series of "duplicate" invoices to be issued the sole purpose of which was to defraud Procapui.(emphasis added)**

The Complaint continues:

**Racketeering Act Three:** (wire fraud)

_____

[2]Exhibit C annexed hereto for the information of the Court is only one in a series of invoices all of which bore the suffix "T" and all of which materially differed from the accurate invoices.

62. **For a continuous period from 2001 through 2004[3], Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins, acting in concert, caused approximately 265 wire transfers** to be sent either to the bank of Procapui or to other recipients ostensibly for the benefit of Procapui, none of which reflected the value of good sold and delivered to G.F. Higgins by Procapui.

63. **For a continuous period from 2001 through 2004**, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins, acting in concert, **wired funds due Procapui to third parties, knowing that those third-parties would divert the funds from Procapui** and, upon information and belief, to Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins.

64. For a continuous period from 2001 through 2004, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins, acting in concert, using the wires, altered the invoices of Procapui **for the purpose of depriving Procapui of the benefit of its sales and diverting that benefit to Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins** (Exhibit D).

65. **For a continuous period from 2001 through 2004**, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins, acting in concert, using the wires, **defrauded Sovereign Bank, from which G.F. Higgins obtained a line of credit, solely for the purpose of permitting them to continue to use the wires to defraud Procapui**.

66. For a continuous period from 2001 through 2004. Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins, acting in concert, defrauded the United States Customs Service by mis-reporting the value of good sold and delivered by Procapui and exported by Procapui to the United States and imported by G.F. Higgins.

In the face of the allegations of the Complaint, Movants argue that a RICO complaint must set forth

---

[3]During the period 2001 through 2004, though undisclosed to this Court by Movants, there were 148 separate invoices and  and 276 separate wire transfers.

"the time, place and specific content of the false representations as well as the identities of the parties to the misrepresentations". **It must also particularize each defendant's alleged participation in the fraud.** [Movant's Memorandum of Law, p. 6](emphasis supplied)

The Complaint herein sets forth not only what each defendant is alleged to have done, the specific period of time within which each is alleged to have participated in the fraud, where and how each's participation took place but also the reason for the alleged fraud and how defendants profited from it to the detriment of Procapui.

In the presence of the above allegations, Movants have the temerity to argue:

In the entire 17 page, 86 paragraph complaint, there is not one specific date including day, or even month, and year. Paragraphs 11, 14, 19, 23, 30, 50 and 51 each alleged something happened "in or about" a certain year, which references go back to 1992. [Movants' Memorandum of Law, p. 7]

Even a cursory examination of these paragraphs reveals that they are included as contextual recitations of various historical events germane to the matter.[4]

---

[4]Paragraph 11 - year of Layani approaching Anavian and his sister regarding the "formation" of RIMIJO
Paragraph 14 - year of formation of Interbras
Paragraph 19 - year of formation of MC Holdings
Paragraph 23 - year Layani approached Anavian to invest in Procapui
Paragraph 30 - year Layani and Blackman introduced Procapui to Higgins
Paragraph 50 -

> **In or about 2004, and for a continuous period thereafter**, Layani. acting in concert with, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins threatened and coerced plaintiffs advising them that any attempt to redress or correct the acts complained of would result in the death of Anavian or members of his immediate family **(Exhibit A).** (emphasis added)

Paragraph 51 -

> **In or about 2004, and for a continuous period thereafter**, Layani threatened and coerced Anavian, advising him that any attempt to redress the grievances of plaintiff or to report the activities complained of to the authorities of either the United States or the Republic of Brazil would result in the death of Anavian or members of his immediate family **(Exhibits A and B).** (emphasis added)

9

Trifling with this Court, Movants argue that the actual allegations of wrongdoing are also not pleaded with particularity.  They state:

> Paragraphs 55, 60, 62, 63, 64, 65 and 66 allege that the wrongful conduct was committed during the period 2001 to 2004.[Movants' Memorandum of Law, p. 7]

They apparently choose to ignore that each of those paragraphs refers to a continuing acts of mail and wire fraud spanning a number of years involving 148 separate invoices and 276 separate wire transfers, an uninterrupted series of "duplicate" invoices[5] and almost daily communications between Movants and Layani all in furtherance of the acts underlying the Complaint.  For the convenience of the Court, the temporal references of each of the paragraphs are set forth herein:

> Paragraph 55 - **Commencing in or about 2001 until late 2004**, Layani, acting in concert with, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins engaged in a pattern of using the mails to transmit doctored and altered invoices of Procapui to G.F. Higgins allegedly representing the sale of goods by Procapui to G.F. Higgins
>
> Paragraph 60 - In furtherance of this scheme, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins contrived to have **an uninterrupted series of invoices spanning the period from 2001 through 2004**[6] issued from Procapui to G.F. Higgins which did not reflect the fair value of the goods sold and delivered by Procapui to G.F. Higgins
>
> Paragraph 62 - **For a continuous period from 2001 through 2004**, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins, acting in concert, **caused approximately 265 wire**

---

[5]A complete list of the wires transfers including date, amount, sender and recipient has been provided to Movants together with a complete compendium of each and every invoice sent by Procapui and reach and every alleged "T" or duplicate invoice and copies of each such invoice in their entirety.

[6]Procapui did not even have a complete list of the invoices until Spring, 2007 when they were produced by Movants in the State action.

**transfers**[7] to be sent either to the bank of Procapui or to other recipients ostensibly for the benefit of Procapui, none of which reflected the value of good sold and delivered to G.F. Higgins by Procapui.

Paragraph 63 - **For a continuous period from 2001 through 2004,** Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins, acting in concert, wired funds due Procapui to third parties, knowing that those third-parties would divert the funds from Procapui and, upon information and belief, to Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins

Paragraph 64 - **For a continuous period from 2001 through 2004,** Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins, acting in concert, using the wires, altered the invoices of Procapui for the purpose of depriving Procapui of the benefit of its sales and diverting that benefit to Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins (Exhibit D).

Paragraph 65 - **For a continuous period from 2001 through 2004**, Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins, acting in concert, using the wires, defrauded Sovereign Bank, from which G.F. Higgins obtained a line of credit, solely for the purpose of permitting them to continue to use the wires to defraud Procapui.

66. **For a continuous period from 2001 through 2004.** Rubin, Blackman, Gerald Higgins, G.F. Higgins, Robert Higgins and Thomas Higgins, acting in concert, defrauded the United states Customs Service by mis-reporting the value of good sold and delivered by Procapui and exported by Procapui to the United States and imported by G.F. Higgins.(emphasis added)

Our court has already dealt with the allegations made by Movants herein regarding the alleged infirmities of the Complaint. As held in ***Executive Photo, Inc. v. Norrell, 765 F.Supp. 844 (S.D.N.Y.1991):***

Allegations that defendants, over a two and one-half-year period, had engaged in a number of illegal acts, including stealing merchandise from plaintiff's storeroom, were sufficient to satisfy continuity requirement of the Racketeer Influenced and Corrupt Organizations Act (RICO), despite

---

[7]Since most of the wire transfers went to recipients other than Procapu's approved Brazilian bank, Procapui was completely unaware of the dates, amounts and timing of the wire transfers until Spring, 2007 as a result of discovery in the State action.

failure of plaintiff to allege specific date on which predicate activity began.

The Circuit Courts have also sustained RICO complaints alleging a series of racketeering activities over a period of years, especially where, as here those activities took place on nearly a daily basis during the period alleged.

> RICO violations were pled with sufficient specificity, by allegations referring to parties initiating racketeering activity, allegations of specific activities of misappropriation of trade secrets and method of use of mails to further misappropriation as part of racketeering activity, and allegation that monies obtained from misappropriation of trade secrets through wire/mail were used to further defendants' racketeering activity. Formax, Inc. v. Hostert, C.A.Fed. (Ill.) 1988, 841 F.2d 388, 5 U.S.P.Q.2d 1939

Citing this Court to **DiVittorio v. Equidyne Extractive Industries, Inc. 822 F.2d 1242 (2d Cir., 1987)**, Movants argue that their "participation" in the fraud is not sufficiently set forth. Even a passing reference to the Complaint, belies any such assertion. The Court in **De Vittorio**, reversing, in part, the lower court's finding of insufficient particularity held:

> Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits. See Reingold v. Deloitte Haskins & Sells, 599 F.Supp. 1241, 1266 (S.D.N.Y.1984) (citing authorities). Further, Rule 9(b) pleadings cannot be based upon information and belief. Segal v. Gordon, 467 F.2d 602, 608 (2d Cir.1972). There is a recognized exception to this rule, however, that fraud allegations may be so alleged as to facts peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based. See Luce v. Edelstein, 802 F.2d 49, 54 n. 1 (2d Cir.1986); Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 379 (2d Cir.1974), cert. denied, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); Segal v. Gordon, 467 F.2d 602, 608 (2d Cir.1972); Equitable Life Assur. Soc'y v. Alexander Grant & Co., 627 F.Supp. 1023, 1029 (S.D.N.Y.1985); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1298, at 416 (1969). See also Devaney v. Chester, 813 F.2d 566, 568 (2d Cir.1987); Connecticut Nat'l Bank v. Fluor Corp., 808 F.2d 957, 960 (2d Cir.1987).

It is apparent that Movants have been given fair notice of the claims against them.

Movants failed to disclose to this Court that the Court in *Di Vittorio* virtually the entire complaint was alleged "on information and belief" and the Court noted that there was no statement as to what upon which the information and belief was based.  This is certainly not the case here, wherein Procapui has alleged an uninterrupted series of wire transfers to accounts other than Procapui's and an uninterrupted series of "false" invoices regarding which Movants have admitted being both sender and recipientsrespectively.   The same frailty accompanies Movants' reliance upon *Stern v. Leucadia Nat. Corp.,844 F.2d 997 (2d Cir., 1988)*, yet another securities fraud case,  wherein plaintiff failed to allege the connection between defendants and the alleged fraudulent investment materials.

It is apparent that plaintiff has complied with F.R. Civ.  P.  Rule 9 and that the Complaint herein is stated with more than the requisite particularity.

## PLAINTIFF HAS PUT DEFENDANTS ON NOTICE OF HOW THEY PARTICIPATED IN THE SCHEME WHICH DAMAGED PLAINTIFF AND THE MOTIVATION FOR THEIR PARTICIPATION

This is an area in which Movants' stream-of-consciousness Memorandum of Law becomes somewhat confusing.  Reconstructed in the most generous fashion, it appears that Movants are complaining that the Complaint does not set forth the manner in which (a) they participated in the extortion [Movants' Memorandum of Law, pp.  8-9], or (b) how Movants may be involved in the scheme involving the fraudulent invoices [Movants' Memorandum of Law, pp 10-11, or (c) Movants could not be held responsible for "sending" money to Procapui, albeit in derogation of the Bills of Lading and in contravention of US and Brazilian Law [Movants' Memorandum of Law, pp.  11-12].

Either Movants are trifling with this Court or have not read the Complaint and the exhibits annexed thereto.

Dealing with each of the above laments individually, it is apparent that the statement of

Leyla Anavian sets forth that she was informed by Layani that he had been made the subject of a series of threats by Movants, Rubin and Blackman that they would injure both Layani and his family if he took any steps to disclose the activities of defendants to the shareholders of Procapui. These conversations took place in 2005 and, according to Leyla Anavian, Layani informed her that the threats commenced in 2003, although obviously she was unaware of them until her son confessed the situation to her in 2005.

To the extent that such threats were made, they obviously constitute extortion and were intended to further defendants activities by concealing them from Procapui and its owners. In addition, the statement of Procapui's internal accountant states that he and the government inspector of Procapui were also threatened for the purpose of preventing them from disclosing the illicit activities of defendants.

Movants next lament is even more perplexing. Apparently, they suggest that they could not have damaged Procapui by "receiving" invoices. However, they ignore the allegation of the complaint that the entire relationship between G.F. Higgins and Procapui was fraudulent. Not only were Movants and Layani acting in concert to defraud Procapui but also they were also involved in a scheme to profit by those activities. Apparently, Movants chose to ignore that sworn statement of Layani which states, in pertinent part:

> On June 29th, 2004(sic) [document dated June 24, 2005] I have personally declared that I personally have diverted funds, profits and capital from Procapui Ltda. Brazil. This process as partially done with the help of shareholder officers of G.F. Higgins Pembroke USA. Specifically, Gerry Higgins and Thomas Higgins [Complaint Exhibit D]

Layani then goes on to report on a portion of the motivation for the fraudulent invoices, stating:

> Our official invoices for shipments of lobsters and shrimps from Procapui Ltda Brasil; were approximately 20-50% less than actual real value of "same day price" of the"same type of goods". This extra 20-50% was shared between Higgins and myself, Marcial Gerald Layani

14

Were the above not enough, Layani's statement goes on to state another motivation for the scheme and the total lack of knowledge of the scheme either by Procapui or its shareholders. He states:

> Thomas Higgins has full knowledge of this fact. Plus the facts such as, we were shipping illegal size lobsters (sizes 2 & 3) from Brazil. (the shared profits were very high on these illegal lobsters). And also both Thomas and Gerry Higgins were well aware that the money send (sic) to various accounts-other than Procapui Ltda, in Brazil-;were for our mutual benefits and for our illegal activities. And the money send (sic) had absolutely nothing to do with Procapui Ltda., and with personal guarantee of Jozef Anavian.
>
> As a matter of record, G.F. Higgins owes Procapui Ltda.. Brasil, over $1,000,000.00 for the actual shipments. Plus he owes Procapui Ltda ., and its shareholders one half of all the illegitimate discounts that they have received.
>
> All these were done with total secrecy from the shareholders of Procapui Ltda., shareholders .None of the members of my family or the shareholders of Procapui Ltda., were aware of any of these illegal activities.

In the face of these statements, Movants allege that they are uncertain how they were involved in the scheme, how Procapui was damaged by it and what their motivation was, or could have been, for the scheme in the first place.  This Court must reject this type of chicanery.

Lastly, Movants protest that they were the ones "sending" the money to Procapui[8].  Of course they were sending it; they were not only getting Procapui's merchandise they were also getting highly profitable "illegal" lobsters and "kickbacks" by sending the money to money launderers in the US and Brazil.

---

[8]Interestingly, apparently Higgins did not do all of this with their own money.  Higgins negotiated a line of credit with its Bank in Massachusetts.  It sent a substantial amount of that line of credit to Layani and, at one point, had sent more that $2.1 million in outstanding funds despite a $750,000 limitation on the "line of credit" agreement.  In order to comply with the requirements of the Bank, Higgins then defrauded its bank by short-term borrowing of funds from Anavian, Anavian's family and friends and others which it deposited in its Bank solely for the number of days required and then re-wired the funds back to the lenders.  Movants would have this Court conclude that they did all of this in furtherance of a simple, arms-length business transaction.

**PLAINTIFF HAS PLED AN "ENTERPRISE", A "PATTERN OF RACKETEERING ACTIVITY, A SEAMLESS SERIES OF "PREDICATE ACTS" AND "INJURY" AND "STANDING"**

As this Court is aware, a claim for relief under RICO must include an "enterprise" a "pattern of racketeering activity" a number of statutorily defined "predicate acts" and "injury and standing". All of those are pled in the Complaint herein.

Without citing this Court to any pertinent authority, Movants seem to suggest that an "enterprise" does not exist herein. As this Court is aware, an "enterprise" for the purposes of RICO is any association in which the parties are associated either legally or "in fact".

Defendants cannot argue that they were not associated in fact.[9]

Movants suggest that our Court have struggled with the issue of what is a "pattern of racketeering activity" [Movants' Memorandum of Law, p. 15]. However, that struggle has never involved an uninterrupted series of 265 odd wire transfers spanning a period of four years and approximately 65 bogus invoices over the same period. It is respectfully submitted that our Courts would have no difficulty in concluding that seamless list of events as a "pattern"

Movants concede that the predicate acts alleged in the Complaint are, in fact, predicate acts under RICO, they simply suggest that they have not been placed on adequate notice of them.

It is respectfully, submitted that injury and standing are evident from the Complaint itself.

---

[9]In fact, there may have also been some legal association. During discovery in the State action it was discovered for the first time that G.F. Higgins included Procapui on its letterhead holding out Procapui as a division of G.F. Higgins. Higgins testified that it purchased the rights to use the logo and name of Procapui on its letterhead, though there is no record whatsoever of any such transaction in the books and records of Procapui.

## MOVANTS' REFERENCE TO THE STATUTE
## OF LIMITATIONS IS A "RED HERRING"

Obviously attempting to avoid proceeding on the merits through every procedural avenue possible, Movants suggest that the Complaint herein is time barred but solely as to claims which could have been discovered by July 24, 2003.

Since numerous of the claimed fraudulent activities took place after July 24, 2003 and throughout 2005 and into 2005, obviously the motion does not dispose of the claims for relief herein since apparently, not even Movants are arguing that such acts could or should have been discovered prior to their happening.

While the statute of limitations for claims brought under RICO is four years, Movants are certainly aware that that period does not even begin to accrue until Procapui either discovered or should have discovered the facts underlying the claims made.

> Four-year limitations period applicable to homeowners' Racketeer Influenced and Corrupt Organizations Act (RICO) action against builder's employees who allegedly fraudulently passed off nonarchitects as architects to design and supervise home remodeling project did not commence to run when homeowners discovered fraud that served as basis of their RICO claim; period commenced to run when homeowners discovered or should have discovered injuries to their property arising from that fraud. Moeller v. Zaccaria, S.D.N.Y.1993, 831 F.Supp. 1046.

It is obvious that defendants not only defrauded Procapui but also took every possible step to conceal their fraud, mis-direct funds, fraudulently duplicate invoices and then move, conceal or destroy each and every document which might shed light on their activities.  This was done with such abandon that Procapui was required to re-construct defendants' activities from pieces of documentation obtained from third-parties and through lawsuits commenced against it in Brazil.

In the matter at bar, it is uncontested that Procapui did not become aware of defendants fraudulent activities until the latter part of early 2006.  In fact, the Central Bank of Brazil was advising Procapui that Movants still owed it approximately $1.5 million at the time that Movants commenced their State Court action alleging that they were owed approximately $1.3 million.  In fact, it was the commencement of that action which triggered the investigation which led, in part, to the Complaint herein.  The declaration of Jozef Anavian submitted herewith fully sets forth the efforts which were made to discover what had actually happened to Procapui and its assets.

The fact that these events were not known to Procapui and could not have been known to it prior to the commencement of the State action is evident from the action itself.  Procapui's records, registered and filed with the Central Bank of Brazil, stated categorically that G.F. Higgins was substantially indebted to Procapui.  To the contrary, however, Higgins claimed that Procapui was indebted to it and supported those allegations with a schedule of payments and shipments which bore no relationship to Procapui's records.

## THERE IS NO BASIS UPON WHICH
## TO STAY THE STATE COURT ACTION

Movant's last attempt to evade the issues herein on the merits is to seek to stay this action in favor of the State court action, which, of course, does not involve the same issues, does not have all of the parties before it and cannot fully adjudicate and resolve the dispute between Procapui and all of the actors in its demise.

Again in a complete absence of candor, Movants do not disclose to this Court that they were advised of this action as early as September, 2006[10] and that the only reason why discovery took place in the State action was that that action was pending, parties were available and discovery was needed in aid of the federal Complaint.  As soon as that discovery was completed,

---

[10]Movants also failed to disclose that counsel had agreed to stay the New York action by stipulation, of course, preserving jurisdictional and statute of limitations defenses and request the State court to place the State action on the "suspense docket" pending the adjudication of the federal action.  Apparently, movants changed their mind regarding that approach.

the federal action was filed.

This action seeks to redress Procapui's claims against Movants but also against Rubin, Blackman and Layani for their involvement in the destruction of Procapui which may or may not have involved Movants[11].

This action was filed specifically to bring the entire controversy before one court and all of the parties involved before that court and dispose of the controversy in its entirety.  As such, it is the State action which should be stayed and not this action.

In support of their request Movants cite this Court to *Coopers & Lybrand v.Sun-Diamond Growers of CA, 912 F.2d 1135 (9ᵗʰ Cir., 1990)* wherein the Court stated specifically that the Colorado River rule is not to be applied except in extraordinary and extremely limited circumstances.  The Court held:

> The Colorado River doctrine is not a recognized form of abstention. Colorado River Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). Instead, it is a form of deference to state court jurisdiction. Federal Deposit Ins. Corp. v. Nichols, 885 F.2d 633, 637 (9th Cir.1989). An exercise of Colorado River deference, however, is reviewed under the same abuse of discretion standard applied to abstention decisions. Id.
>
> *1138 Abuse of discretion review in the abstention context " 'should not be confused with the broader abuse of discretion test used in other matters, such as rulings on certain evidentiary issues.' " Id. (quoting American Int'l Underwriters, Inc. v. Continental Ins. Co., 843 F.2d 1253, 1256 (9th Cir.1988)). " 'In abstention cases, "discretion must be exercised within the narrow and specific limits prescribed...." Thus the district court judge in this case [was required to exercise his] discretion within the "exceptional circumstances" limits' " of Colorado River deference. Nakash v. Marciano, 882 F.2d 1411, 1413 (9th Cir.1989) (quoting American Int'l Underwriters, Inc. v. Continental Ins. Co., 843 F.2d at 1256) (quoting C-Y Dev. Co. v. City of Redlands, 703 F.2d 375, 377 (9th Cir.1983))).

---

[11]Documents discovered to date indicate that at least Layani and Rubin orchestrated a scheme to divert payments due Procapui to off-shore banks in the Caribbean.  In certain instances half of the funds were sent to Procapui and another half sent to a bank in Florida for the account of a third-party entity which had yet another off-shore account.  Procapui, as yet having no discovery whatsoever other than the depositions of Movants, is unaware whether those transfers were in furtherance of the "kickback" scheme with Movants or involved simply Layani and Rubin.

The Colorado River Rule arose from a Supreme Court case entitled **Colorado River Water Conservation Dist. v. U. S., 824 U.S. 800, 96 S.Ct. 1236 (1976)** which involved the Indian Nations and rights to water resources within the state of Colorado over which the Southwestern states had enacted an elaborate allocation protocol.  The Court cautioned:

> Abstention from the exercise of federal jurisdiction is the exception, not the rule. "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188-189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163, 1166 (1959). "(I)t was *814  never a doctrine of equity that a federal court should exercise its judicial discretion to dismiss a suit merely because a State court could entertain it." Alabama Pub. Serv. Comm'n. v. Southern R. Co., 341 U.S. 341, 361, 71 S.Ct. 762, 774, 95 L.Ed. 1002, 1015 (1951) (Frankfurter, J., concurring in result). Our decisions have confined the circumstances appropriate for abstention to three general categories.

Clearly, there are no facts herein which would warrant exercise of the doctrine of abstention.

## CONCLUSION

For the reasons above stated, it is respectfully requested that the motion be in all respects denied.

Respectfully submitted

**DE MAIO & HUGHES, LLC.**

by_____
Luigi P. De Maio (LPD 4175)

20

Attorneys for Plaintiff
330 East 30th Street
New York, NY 10016
(212)888-8300


TO:

John Phelan, III, Esq.
Attorney for Moving Defendants
1285 Avenue of the Americas- Suite 3500
New York, NY 10019