UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
PROCAPUI-PRODUTORES de CAMAROES de
ICAPUI LTDA.

                                                    07 Civil Action
                          Plaintiff,                File No. 6627-BSJ
                                                    Mag AJP

              v.


MARCIAL GERALD LAYANI, G. F. HIGGINS,
INC., THERESA HIGGINS, as Executrix of
THE ESTATE OF GERALD FRANCIS HIGGINS,
THOMAS HIGGINS, ROBERT HIGGINS,
RICHARD RUBIN and NOEL BLACKMAN,


                          Defendants.
------------------------------------------------------------------x
G.F. HIGGINS, INC., THERESA HIGGINS, as
Executrix of the Estate of GERALD FRANCIS
HIGGINS, THOMAS HIGGINS and ROBERT
HIGGINS,


                   Third Party and
                    Supplemental Plaintiffs,


              v.


JOZEF ANAVIAN,


                   Third Party and
                    Supplemental Defendant.
------------------------------------------------------------------x

## REPLY MEMORANDUM OF LAW IN SUPPORT
## OF MOTION TO DISMISS AMENDED COMPLAINT
## AND FOR OTHER RELIEF

-1-

## INTRODUCTION AND SUMMARY

This Memorandum is offered in further support of the Motion of G.F. Higgins, Inc., Theresa Higgins as Executrix of the Estate of Gerald Francis Higgins, Thomas Higgins and Robert Higgins (the "Higgins Defendants" or the "Higgins Parties") seeking to dismiss, pursuant to Rules 9(b), 12(b) F.R.Civ.P. and other statutes and rules, the Amended Complaint of Plaintiff dated February 20, 2008 and served and filed February 21, 2008, for other relief and to reply to the papers submitted by Plaintiff in Response to our Motion.

The answering papers of Plaintiff fail utterly to comply with the Court's directions in its January 11, 2008 decision and continue the defects and deficiencies of the initial Complaint.  The Amended Complaint continues to lack the specificity and particularity required of a RICO or fraud pleading and those claims must be dismissed.  No allegation is made as to which Defendant did what; no allegation of what misstatements, misrepresentation or omissions is made; no assertion as to what damage or loss was occasioned by what fraudulent act is attempted; no allegation is made as to what Plaintiff's damages are or how they are calculated (A complete Rule 26(a)(1)(A)(iii) calculation is many months past due.)  The schedules of transactions attached to the Amended Complaint provide dates and amounts of numerous transactions without describing what each Defendant

did or how it was fraudulent.  The declaration of Jozef Anavian filed with

Plaintiff's answering papers, if anything, only makes matters worse by its

vagueness and complete reliance on hearsay from unspecified persons.  The

declaration demonstrates that Plaintiff has no proof and is relying on rumor,

innuendo and surmise.  Repeatedly says "... I learned... " without saying how or

from whom or even "... I surmise...".  It exposes to the Court the utter guesswork

nature of Plaintiff's claims. Mr. Anavian thinks something must have happened so

he "surmises" it did and that the Higginses did it.

The Court's attention is respectfully directed to the papers filed with our

Motion on March 6, 2006 and the documents filed therewith and to our papers

filed in August and September, 2007 in support of our Motion addressed to the

initial Complaint.  We will attempt not to repeat unnecessarily the arguments made

there except as necessary to reply to Plaintiff's answering papers.  We note that

Plaintiff's answering papers contain a declaration of Jozef Anavian to which were

attached a number of exhibits.  The Court noted in her January 11, 2008 decision

that affidavits were inappropriate to the consideration of a Rule 12(b)(6) motion,

they could be considered on the subject matter jurisdiction portion of Defendants'

Motion.  (Decis. p. 13.)  The Anavian Declaration submitted on the current Motion

addressing the Amended Complaint is the identical declaration to that submitted

on the earlier motion.  Plaintiff in if brief in opposition to the Motion states that the Anavian declaration is submitted on the Statute of Limitations issue to inform the Court as to when Jozef Anavian "discovered" the matters alleged to be fraudulent.  While the issue is when Plaintiff - not Jozef Anavian but Plaintiff Procapui - discovered or through the exercise of appropriate diligence, should have "discovered" whatever it is said was going on, since Plaintiffs are attempting to place before the Court a dispute as to this issue, we have provided affidavit proof as well.  Filed herewith is a declaration of Defendant Thomas Higgins dated April 29, 2008 as well as a declaration of Michael Gerald Layani dated April 29, 2008.  These declarations are not intended to nor do the contradict or challenge every false or incorrect assertion in Plaintiff's Amended Complaint or the Anavian declaration.  They deal chiefly with facts related to Anavian's assertions regarding how and when he says he learned of the activities complained of and to the issue of the capacity of the Plaintiff to bring this action.  The Layani declaration also deals with the documents Plaintiff says he signed but which he says he did not and on his assertion that he still controls Procapui and that this purported lawsuit is entirely unauthorized.    To the extent they include other matter extraneous to the above issues, the Court need not consider such material at this time.

**POINT I**

**THE AMENDED COMPLAINT LACKS
THE PARTICULARITY REQUIRED**

The Court is respectfully referred to our Memorandum dated March 6, 2008

on this motion as well as to the Memorandum on the earlier motion dated August

16, 2007 on the motion attacking the initial complaint and the reply Memorandum

on that motion dated September 25, 2007.  Most critically, the Court is

respectfully referred to its decision on the earlier motion dated January 11, 2008

for the standards of particularity required in pleading fraud claims as well as RICO

claims founded in fraud.  Since, Plaintiff has now withdrawn the earlier pleaded

"extortion" and threats RICO claim, the RICO claims remaining all attempt to

allege fraud of one kind or another as does the purported common law fraud claim.

Neither the initial Complaint nor the Amended Complaint assert that

discovery is required in order to comply with Plaintiff's Rule 11 obligations in

signing the pleadings.  Under Rule 11(b)(3) F.R.Civ.P., if the pleading does not so

state, it is assumed that Plaintiff has the evidence it needs and has the information

needed to state the facts.  Plaintiff has failed to do so.

Plaintiff's counsel says that Plaintiff's claims are that (i) Higgins and Layani

agreed to underprice the fish sold to Higgins and somehow to split the resulting

profit between them; and (ii) that Higgins sent wire transfer payments to third parties, chiefly but possibly not exclusively, the payments made to Star Finance and Tansy and again split the money with Layani all to the detriment of Procapui who should have been entitled to those sums. The Higgins parties, of course, deny all these accusations.

With regard to the "underpricing" of fish and claimed splitting of profits, there is not a single transaction identified in which the "correct" or market price is stated, not one. There is no standard by which anyone can say what the alleged "correct" price is. There is no market for shrimp and lobster identified from which such information might be gleaned. There is no formula set out by which a contract price reached while the shellfish are still alive and in the water in or near Brazil and which need to be caught, frozen, containerized and shipped to U.S. ports, cleared customs and FDA review, and delivered to their destination - weeks in all - can be determined. Plaintiff would need to point to some shellfish futures market to determine what the "correct" price is. Plaintiff has pointed to none and there is none. The parties each, using experience and business judgment and "feel" in each transaction, negotiated and agreed on a price they could all live with. If Plaintiff wants to allege the corrupt scheme it shamelessly and without evidence tries to set out, it needs to tell the Court and the Higgins parties what the

underpriced transactions were, by how much they departed from the "correct" price and from where the "correct" price figures are derived.

While the above alone makes the allegation of underpricing nonsensical, far more important is the fact that Plaintiff does not and cannot say what was done with the supposed profits other than they were split. Where did the money go? How was it divided? It does not say because there is no evidence whatsoever and there is no evidence because it did not happen.

Even more critical is that Plaintiff does not say how this "conspiracy" was formed and who were parties to it. Did every one of the Higginses sit down with Layani and agree? On what date or dates did they each join the "conspiracy". What did each of them do to carry out the "conspiracy"? How were the allegedly illegal profits split? 50-50? What? Who among the Higginses set the prices? Who checked the "correct" prices so they would know how to "underprice". What information was exchanged with Layani on all of this? If there were a conspiracy, certainly there would have to have been careful coordination on price information. The problem described above of setting legitimate prices for a perishable commodity weeks in advance without reliable market quotations is difficult enough. Trying to do so in order to build in a disguised profit would be considerably more complex. Although there have been thousands of pages of

documents exchanged in discovery both in this case and in the State Court litigation, not one page has been produced which evidences any of this or, certainly, pointed to by Plaintiff. And it is not in the Amended Complaint where it is required to be.

Plaintiff points to the invoices and "T" invoices as somehow bearing on all this. All of the invoices were prepared by Procapui, not by the Higginses - every one. That, of course, is normal business practice. The seller prepares the invoice. In this case, the invoices were functionally meaningless to the Higginses. Under the terms of the Working Capital Agreement, annexed to the Answer as an exhibit, the prices were set by orders prepared by the Higginses. Funds were first advanced by G.F. Higgins to Procapui and then Procapui either sent fish with the value of the shipment credited against the balance of the advance amount or Procapui was to repay the net advances in cash with the net amount brought to zero or close to zero by each year end. Thus, there were no payments by G.F. Higgins to Procapui against each shipment of fish. The value of each shipment for the above calculation was arrived at by the above process of negotiation and was embodied in the orders. The invoices, prepared solely by Procapui, had no part in the process. From Higgins's perspective, they were meaningless except that, for shipping purposes, they needed to be included with the shipment. There was no

financial implication arising from the invoices. What Procapui intended them to mean, if anything, was, from the Higgins's point of view, both unknown and of no consequence.

For Procapui to base its "fraud" claims against the Higginses on invoices which it and it alone prepared, and which had no meaning to G.F Higgins, is nonsensical. How can a document which Procapui prepared and sent by misleading as to Procapui? How can a document which does not reflect either the actual price or the "correct" price of the goods shipped be part of the "underpricing" scheme? How can Plaintiff ignore the dozens of orders which showed the agreed transaction price and which were prepared by Higgins and sent to Procapui and for which Procapui was actually credited? Higgins's documents are correct and disclose everything correctly. Procapui's are alleged to be phony. Yet Plaintiff relies on its invoices to attempt to allege the fraudulent scheme and ignores Higgins's correct orders, the only documents which have any meaning. In assessing whether Plaintiff has met its particularity obligations, the Court must look at what Plaintiff says are the basis for its claims it has done so. That asserted basis includes pointing to the invoices. They are pointing in the wrong direction.

The aspect of Plaintiff's theories which has to do with the Higginses sending money to third parties is subject to just as much confusion and

meaningless palaver. The payments by G.F. Higgins were not payments for shipments of fish. They were advances under the working capital agreement. Under the terms of the working capital agreement, G.F. Higgins was not only permitted, it was required, to follow the instructions of Procapui in sending funds by wire transfer to it. In each case, wire transfers to Procapui or to various banks on its behalf, or to Star or Tansy or to Mr. Anavian's sister, Rita Ruth Zahabian or to Mr. Anavian's bank or to Nash, Ltda, a company owned by Mr. Anavian, were all sent pursuant to written instructions signed by various officers and staff of Procapui, including Layani, Michael Donnelly, Eunice Oliviera or Mr. Anavian himself. Procapui told Higgins where to wire transfer the funds, Higgins was required to do so and did so. All of this is in keeping with the most ordinary and routine business procedures. Businesses often issue wire transfer instructions to send funds due them to third parties or to accounts at various banks. Often, businesses owe money to factors or banks and issue payment instructions to pay such persons directly. All of this is routine and unremarkable.

What Plaintiff tries to do to separate these transactions from the routine is to say that they proceeded from a fraudulent conspiracy between Layani and the Higginses. Here is where particularity utterly fails. Who agreed to what and when did they agree? What agreement was reached with each of the Higgins

Defendants?  When were these agreements reached.  How were the profits split?  In what percentages and where was the money sent?  What did each Defendant do or say?  What statements were made and what was omitted?  How was Plaintiff misled?  Of course, since there was no such fraud, Plaintiff cannot answer these questions.

These issues of alleged "underpricing" and "diversion" underscore what Plaintiff is trying to do here.  Procapui has a business loss.  It tries to figure out why.  It thinks that Layani, Anavian's nephew, may have been up to something, cheating Procapui somehow.  Since most of Procapui's dealings were with Higgins and since Higgins is still a functioning business with, it hopes, deep pockets, it "surmises" Higgins was involved.  Procapui does not simply sue for what it thinks are the sums contractually due it or for the sums sent to third parties which it claims were "diverted", standard business disputes as to who owes whom what, an accounting for a several year business relationship.  Rather it claims a meritless RICO treble damage "conspiracy" and sues all the owners of G.F. Higgins individually, all without any evidence of anything other than routine business dealings that they are trying to sort out.  It cannot plead its claims with the requisite particularity because the claims don't exist.

One of the aspects of the particularity problem is the lack of specificity of

damages. How much was allegedly "diverted" and where did it go and who diverted it and when and how? Plaintiff, in filing its initial Rule 26(a)(1)(A)(iii) disclosures completely omitted any reference to damages or the requirement to set out a "calculation" thereof. It amended the Rule 26 disclosures on November 20, 2007 but still does not make the required disclosures. It says only that its damages are (i) the "aggregate amount invested by plaintiff from its inception" without telling us how much that is or how the amounts invested are related to the claimed RICO "frauds" alleged. It then adds that (ii) the amount of damages is "the amount of unpaid invoices on the books of plaintiff and Central Bank of Brazil" again without saying how much that is or how those amounts are said to derive from the alleged wrongs of the Higgins Defendants. This is especially amazing since Plaintiff claims that Layani took or destroyed all its books and records. We are referred, in part, to books which it says no longer exist.

In brief summary, the Amended Complaint fails to meet the requirements of Rule 9(b) or the Court's earlier ruling and, therefore, the Complaint must be dismissed under Rule 12(b)(6) F.R.Civ.P.

## POINT II

## PLAINTIFF MAY NOT DROP PARTIES WITHOUT A COURT ORDER

Plaintiff virtually concedes in its answering papers that the dropping of parties requires a Court Order under Rules 15 and 21 F.R.Civ.P. That is beyond dispute, particularly, as here, where cross-claims and third party claims have been interposed against the parties sought to be dropped. (See our main brief on this motion.) The Higgins parties' Answer included cross-claims against Defendants Rubin and Layani and a Third Party or Supplemental claim against Anavian. Plaintiff's proposed Amended Complaint purports to simply sweep all that away by not including them in the caption or elsewhere. The Higgins parties made no claims against Defendant Blackman and have no objection to his being dropped but, as to the others, have subsisting claims against them.

Plaintiff could easily have made a cross-motion seeking Court permission to drop parties but, for reasons best known to it, chose not to do so. It still has not formally requested leave to drop parties. It just assumes it is magically done.

In one of the most arrogant arguments and one lacking in the most fundamental understandings of Federal Court jurisdiction, Plaintiff attempts to argue that, somehow, the Higgins parties have "contrived" to create a jurisdictional issue. The issue was one present at the time Plaintiff first filed its

initial complaint.  If Layani were a U.S. citizen domiciled in a foreign country, his presence as a Defendant would destroy diversity jurisdiction.  If the Court dismissed the RICO and fraud claims, as it was being asked to do, therefore, there would be no diversity jurisdiction over the remaining claims.  It was not only the right but the obligation of the Higgins parties to raise this issue.  It is conceivable that this case could otherwise have gone forward on the non-fraud state law claims alone and, after extensive discovery and a trial and, perhaps on appeal, the defect discovered and the case dismissed, leaving everyone with nothing but hundreds of thousands of dollars in legal bills and several lost years to show for it.  Plaintiff itself had an obligation to look into this issue with far more care than it obviously did.  To try to use this as a complaint about Defendants' conduct is stunning.

To say that reaching out to a witness with knowledge of the facts when the Plaintiff says it no longer has any books or records is a contrivance or is proof that there was a "conspiracy" all along is almost as irresponsible.  In his accompanying declaration, Thomas Higgins says that he has not spoken to Mr. Layani since 2005.  All contact has been through counsel.  This is all perfectly appropriate and responsible litigation activity.

While Plaintiff says that Layani's statements on his domicile are "bogus", Plaintiff does not contradict them or deny them or offer any evidence concerning

them.

Plaintiff also tries to assert that, if we want to keep Layani in the case, after the Court drops him we can bring him back in through a third party or supplemental claim which will preserve diversity jurisdiction. While that may be true, it requires us to serve process on My. Layani, an obligation which Plaintiff has failed to execute for over nine months during all of which time, they have known where he is, in Toulouse, France. Plaintiff has created all the problems. They named a man who destroys diversity jurisdiction. They have failed to serve process on him. Now, because they got it wrong, they want to hand the ball to us and leave us with the problem.

To cap off the amazing arguments, Plaintiff also says that we can bring Anavian back in by reserving him and suggests that counsel may accept service of process. There is no need to do so. We made a supplemental and third party claim against Anavian in our Answer to the initial Complaint. We served counsel with the supplemental and third party summons. He executed a waiver of service on Anavian's behalf and we filed it. There is no need to bring Anavian into the case. He is already in the case and before the Court. (Of course, if the Amended Complaint survives in any form, we will serve an Answer and will make a new Third Party and Supplemental claim against Anavian but there is no need to serve

new process on him.)

The Plaintiffs have not succeeded in dropping any parties and will not do so unless and until they seek leave from the Court and the Court so directs.  We have no objection to the dropping of Blackman but the other parties should all remain.

### POINT III

### THE STATUTE OF LIMITATIONS ON
### MOST OF THE RICO CLAIMS HAS RUN

For the reasons set forth in our earlier Memo and as virtually conceded by Plaintiff, the Statute of Limitations for RICO claims is four years and commences to run with each "injury".  A Federal "discovery" of the injury standard is used.

The action was commenced on July 24, 2007.  Any "injury" discovered before July 24, 2003 is, therefore, barred.  Discovery, of course, refers not to actual assembly of all of the facts on all of the elements of the claim and all the facts underlying the claim.  Rather, it means enough to let the Plaintiff know he has been injured and that it's someone's fault.  In the RICO context, it certainly does not mean the Plaintiff must discover the "pattern" of illegal activity giving rise to the RICO allegations.  *Rotella v. Wood*, 528 U.S. 549, 120 S. Ct. 1075, 145 L.Ed. 2d 1047 (2000).

It must be kept firmly in mind that the Plaintiff is NOT Jozef Anavian.  It is

Procapui. Anavian's subjective state of mind is not determinative of when Procapui "discovered" the injuries. Procapui had other accountants and employees besides Anavian and Layani who were involved in these transactions and even an outside accountant. (See declaration of Thomas Higgins regarding Michael Donnelly, the in-house accountant, and Mr. Sidou, the outside accountant who were reviewing or, at least, in a position to do so.) Anavian and Plaintiff's counsel seem to merge Anavian and Procapui as above with the damages issue but it is Procapui, not Anavian we must examine.

We now fortunately have a dispositive judicial admission on this point. In a declaration dated April 29, 2008 in opposition to the Higgins Defendants' motion for sanctions, Plaintiff's counsel, Mr. DeMaio affirmed as follows:

> 6. Furthermore, Procapui learned from Michael Donelly, Procapui's accountant at the time, that the indebtedness of Higgins to Procapui had been reported to Layani on a monthly basis and that the Central Bank had been making inquiries regarding the Higgins account throughout the entire period commencing **in early 2003.** Donelly also confirmed that he had repeatedly advised Layani that the sales to Higgins were unreasonably below market and was consistently told to "shut up". The same accountants prepared a reconciliation of the Higgins open invoices due Procapui from the monthly reports which were given to Layani each and every month. [Emphasis added.]

Thus, by counsel's own words we know that **IN EARLY 2003** "Procapui learned" facts putting them on notice inquiry that there were questions, including

-17-

questions from the Central Bank, about the Higgins accounts.  Whatever Anavian "learned" or didn't "learn", Procapui had "learned" what it needed to know to open an inquiry.  If the Central Bank wanted information, it was clearly important. The reconciliation attached to the DeMaio declaration is almost illegible but it is clear that invoices going bact to February 4, 2003 and up to July 7, 2003 are on the reconciliation.  Fourteen of the 21 transactions listed are thus clearly barred by the RICO Statute of Limitations.  Obviously, whatever the inquiries or questions were, the Higgins Defendants deny they had anything to do with the Higgins parties' conduct.  Whatever they were, though, they were known by Procapui in "early 2003"

There is no allegation in the Amended Complaint of fraudulent concealment of the existence of any claim nor is there any allegation of any facts which could lead to any "adverse domination" theory being applied.  Such facts are the burden of the pleader to plead and prove.  There is no ground to make any such assertion in any event and, as shown above, there were several people in the Company who were in the know as to what was happening who might have taken action.

As to the "underpricing" claim, Procapui knew the minute it received the orders from G.F. Higgins what the price to be paid was.  This was, of course, well before the goods were packed or shipped.  It may be assumed that Procapui knew

what was going on in the "market" in Brazil for shrimp and lobster being exported, i.e., what other exporters were getting for their products. Even if Layani was a conspirator, Mr. Donnelly, discussed in the Thomas Higgins Declaration, was responsible for such matters as part of his duties. The claimed "fraud" was thus easily discoverable before it happened.

As to the "diversion" due to payments to Tansy and Star, again Procapui, through every employee, know when shipments were made to Higgins. Donnelly, Layani, Eunice Oliviera and even Anavian certainly knew that wire transfer instructions went out and to whom Higgins was instructed to send money. Certainly, they knew what money came in through the banks and through the Central Bank. Thus, on the absurd allegation that funds were being diverted (which is denied), they certainly knew that money they were expecting had not arrived. To say that no one at Procapui, even excluding Layani, knew that they had been injured (if they had been) is absurd.

Plaintiff says in its brief that "Procapui's records, registered and filed with the Central Bank of Brazil, stated categorically that G.F. Higgins was substantially indebted to Procapui". If this is true, it shows that Procapui always had the information to determine what it had not been paid and the ability to look into the matter as, for example, by contacting Higgins and asking when they might expect

a certain payment which, of course Higgins would tell them had already been made and to whom.  Of course, Procapui insists it has no records and has produced no copies of anything filed with the Bank of Brazil other than post-dispute summaries showing what they claim as the balance due.

## BALANCE OF RELIEF SOUGHT

With regard to the balance of the relief sought by the Higgins parties, they will rely on their initial moving papers.  It should be noted, however, on the abstention issue, that, although abstention is generally disfavored by the Federal Courts, the equities favor it here.  Plaintiff failed to timely remove this action from State Court.  If this Court strikes the RICO and other fraud claims, this case will represent what it is, an ordinary business dispute between businessmen as to who owes what to whom.  That is what it was in the State Court and it is in the State Court it should remain.

## CONCLUSION

The Court should grant the Higgins Defendants' Motion to Dismiss the RICO and common law fraud counts of the Amended Complaint as lacking requisite particularity.  The Court should then consider the other portions of the Motion including the motion to dismiss for lack of subject matter jurisdiction.  If the motion to dismiss on pleading grounds is denied, the Court should grant the

motion to dismiss the Rico claims prior to July 24, 2003 and Defendants' other

motions.

Dated: New York, NY
      May 2, 2008

                                     Yours, etc.

                                     John J. Phelan, III, P.C.

                                   By/S/_____
                                       John J. Phelan, III (JP8632)
                                   Attorneys for Defendants G.F.
                                  Higgins, Inc., Theresa Higgins, as
                                  Executrix for the Estate of Gerald
                                  Higgins, Thomas Higgins and Robert
                                  Higgins
                                  1285 Avenue of the Americas,
                                   Suite 3500
                                  New York, NY 10019
                                  Tel: (212) 315-3082
                                  Fax: (212) 315-3028
                                  Email: jphelaniii@att.net

TO: Luigi P. DeMaio, Esq.
     DeMaio & Hughes, LLC
     Attorneys for Plaintiff
     330 East 30th Street
     New York, NY 10016
     (212) 888-8300

     Lawrence R. Lonergan, P.C.
     Attorney for Defendant Rubin
     275 Seventh Avenue
     New York, NY 10001
     email: llonergan1@aol.com

Noel Blackman, *Defendant pro se*
14706 Hallwell Ct.
Cypress, TX 77429-2385
NoelBlackman@sbcglobal.net

# CERTIFICATE OF SERVICE

JOHN J. PHELAN, III, hereby certifies as follows:

    1.  I am attorney of record for The Higgins Defendants in the within action and am a member of the bar of this Court.

    2.  On May 2, 2008, I served (i) the Reply Memorandum of Law in Support of the Motion to Dismiss the Amended Complaint and (ii) the declarations of Thomas Higgins and Michael Layani and exhibits on  Luigi DeMaio, Esq, DeMaio & Hughes, 330 East 30th Street, New York, NY 10016, attorneys for Plaintiff, upon Lawrence R. Lonergan, Esq., Attorney for Defendant Rubin, 275 Seventh Avenue, New York, NY 10001 by filing such papers with the Clerk by electronic means on the Court's CM/ECF system and upon Noel Blackman, Defendant *pro* se, by U.S. mail addressed to 14706 Hallwell Ct., Cypress, TX 77429-2385.

Dated:  New York, NY
       May 2, 2008

                                Yours, etc.
                                John J. Phelan, III, P.C.

                                By /S/_____
                                  John J. Phelan, III (JP8632)
                                Attorney for Higgins Defendants
                                1285 Avenue of the Americas, # 3500
                                New York, NY 10019
                                Tel:  (212) 315-3082
                                Fax: (212) 315-3028
                                email: jphelaniii@att.net