UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
PROCAPUI-PRODUTORES de CAMAROES de
ICAPUI LTDA.

      Plaintiff,

   v.

MARCIAL GERALD LAYANI, G. F. HIGGINS,
INC., THERESA HIGGINS, as Executrix of
the Estate of GERALD FRANCIS HIGGINS,
IN
THOMAS HIGGINS, ROBERT HIGGINS,
RICHARD RUBIN and NOEL BLACKMAN,

      Defendants.
-------------------------------------------------------------x
G.F. HIGGINS, INC., THERESA HIGGINS, as
Executrix of the Estate of GERALD FRANCIS
HIGGINS, THOMAS HIGGINS and ROBERT
HIGGINS,

    Third Party and
     Supplemental Plaintiffs,

   v.

JOZEF ANAVIAN,

    Third Party and
     Supplemental Defendant.
-------------------------------------------------------------x

07 Civil Action
File No. 6627-BSJ
Mag. Judge Andrew
J. Peck

DECLARATION OF
THOMAS HIGGINS

REPLY TO
PLAINTIFF'S
OPPOSITION
TO MOTION FOR
SANCTIONS

   **THOMAS HIGGINS,** declares the following under penalty of perjury:

-1-

1. I am a Defendant and Third Party Plaintiff in the above action. I make this Declaration on my own knowledge in reply to the papers of the Plaintiff in opposition to our Motion seeking sanctions against Plaintiff, Third Party Defendant Anavian and against their counsel. I am an officer of G.F. Higgins, Inc. and have been for many years and am personally familiar with all of the matters stated herein.

2. I respectfully refer the Court to my declaration dated April 30, 2008 in reply on our Motion to Dismiss the Amended Complaint.

3. First, I would like to tell the Court that I and the other Higgins parties absolutely deny all the wrongdoing alleged in the Complaint of the Amended Complaint. At no time did we ever divert any funds from Procapui either by underpricing our purchases of shellfish from it or by misdirecting funds due it to third parties. All prices were set based on what we, as businessmen, estimated we could sell the fish for when they arrived in the U.S. several weeks after each order. We negotiated the prices with Mr. Layani or others at Procapui and we arrived at a price. Sometimes, Layani would send an invoice indicating what he had packed and available. On other occasions, Layani would be getting ready to purchase shellfish from others and would want to know what we would be willing to pay for it. In either case, after discussions we would issue an order containing the price and send it to Procapui for their review and acceptance. They then shipped the goods by sea

to us. They even had the possibility, even while the ship was at sea, of diverting the shipment to another purchaser if they could get a better price elsewhere. This was an ordinary business relationship of importing goods from Procapui at negotiated prices. Plaintiff and Anavian, in an attempt to recoup their investment losses are now trying to turn this into some sort of conspiracy. There was none. The only unusual part of our arrangements with Procapui was the fact that we were Procapui's lender. For our business accommodation, we are now being sued and accused of "racketeering".

    4. Our business relationship with Procapui was covered by a written agreement which we have annexed to our Answer in this case. That agreement specifically stated that our orders controlled the prices for the shellfish. We did not have a typical business relationship whereby we ordered goods, they were shipped and then we paid for each shipment. Most of Plaintiff's factual assertions seem to assert that that was how we did things. It was not. Rather, we advanced money to Procapui to help it to capitalize itself and to obtain the supplies it needed to do business with us. We had, we understood, an exclusive right to buy Procapui's output of lobster and shrimp at prices to be negotiated. We advanced funds to Procapui and they were to repay us either by sending us fish for which we would credit them for each shipment at the negotiated price or they had to repay us in cash.

We were to be brought to a zero balance by the end of each year. We then ordered fish as described above and Procapui usually shipped it.

    5. Plaintiff repeatedly brings up the issue of invoices. Invoices were prepared by Procapui and not by us. Whatever they say, it is Procapui saying it. We were not paying each invoice as goods were shipped. Rather, we had already paid for the goods at the times we made the advances. Procapui then owed us fish or cash. If Procapui's personnel or their accountants or the Central Bank of Brazil attempts to reconcile invoices against payments, they will have a very difficult time since that is not the way we did business. Procapui usually sent invoices in advance of each shipment as a way of letting us know what was available for shipment. We would then negotiate a price for the goods listed on the invoice and, if acceptable to both sides, we would send an order. We kept the invoices as part of our files and have now produced them but, since they did not govern the money we were paying Procapui (which was by advance) nor the prices to be paid, we paid them little additional attention. We did not try to reconcile them to our payments since we knew it would not be possible and since we were using a different system.

    6. Procapui accuses us of diverting funds by paying third parties money that was owed to Procapui, notably Star and Tansy. We wire transferred our advances to Procapui pursuant to written instructions received in each and every case from

Procapui, documents on Procapui's letterhead and faxed from Procapui's office in Brazil. Under the terms of our written contract with Procapui we were not only authorized but **required** to follow these instructions. So far as I know, it is ordinary business practice for businessmen to send payments to third parties if directed to do so since the person who is to receive the money may have lenders, suppliers or others to whom he owes money who need to be paid. We had wire transfer instructions for every transfer, many signed by Layani but some signed by Eunice Oliviera, the CEO of Procapui, some signed by Michael Donnelly, its in-house accountant and some signed by Anavian himself. Wire transfers were made to Procapui, to Star and Tansy and to Anavian's bank and to Nash, Ltda., a company owned by Anavian and his sister. Wire transfers were made to Rita Ruth Zahabian, Anavian's other sister, as well as to Claymer International, a company owned by David Tehrani, Anavian's cousin. Wire transfers were made to Piero Brignetti, a friend of Anavian's from Spain. Transfers were made as well to Ben Flamming, a friend of Layani. (All of these relationships were conceded by Anavian during his deposition in the State Court proceeding.) Anavian can hardly complain about a business practice in which he and his friends and business associates enthusiastically participated. We took credit on our accounting for all such wire transfers and considered them part of the balance due. We also received wire

transfers from a variety of sources in repayment of the amounts advanced and credited them to Procapui. We thought nothing unusual about the payments made to third parties pursuant to wire transfer instructions. We certainly were not sending them to third parties as a way of diverting funds. If funds were diverted, and we have no reason to think they were, we never received any of the proceeds.

7. Procapui and Anavian, in their pleadings and declarations make much of my correspondence with Layani regarding a company named IMA, Ltda. As the Court will see, Mr. Layani asked me to tell his bank something that would help him get a loan for IMA which I understood to be a new venture owned by the same persons, Layani and Anavian, as owned Procapui. I did not answer the letter in the way that he asked because I would not be put in a position of lying to the bank. I confirmed to the bank that we had a "...pre existing relationship with the principals of IMA Ltd." We certainly did with Anavian and Layani. Thereafter, I referred to IMA without using the word "principals" as I should have. That was sloppy but not intended to mislead anyone. The letter is otherwise completely accurate. The Court should know that, so far as I am aware, IMA Ltd. never got off the ground. We certainly never did any business with IMA and, so far as I know, they never borrowed any money and never engaged in business.

8. Next, Procapui accuses us of importing "undersized" and "illegal" lobster

tails from Brazil. They try to make this some sort of a conspiracy with Layani which somehow would work an additional fraud on Procapui. It did not happen. The Plaintiff seems to be trying to make a claim that Layani and the Higginses imported "illegal" lobsters into the U.S. and that this created large profits which were then supposedly diverted from Procapui and split between Layani and us. Again, this did not happen. There was a very brief period of no more than a couple of months between May and July of 2004 when the U.S. and/or the Brazilian governments prohibited the export or import of lobsters under a certain size. **There were no shipments of any lobsters of any size during that period. End of story.** There were no shipments of "illegal" lobsters because there were no shipments of any lobsters at all. None. There could, therefore, be no undue profits or any splitting of undue profits because there were no transactions on which to profit. Plaintiff points to no document or other evidence of any transaction in "undersized" lobster because, of course, there are none. Even Mr. Anavian agrees that there were no shipments during that period. As a sidelight to this "undersized" fish nonsense, but a sidelight which is of critical importance to this case, the so-called "confession" said to be that of Mr. Layani, dated June 24, 2005 discusses "...shipping illegal size lobsters (sizes 2 and 3) from Brazil." Since none were shipped, this reaffirms the contrived nature of this "confession". I understand Mr. Layani says he did not sign

that paper. If he had, he would have been making it up. Someone certainly did.

9. The Plaintiff also attempts to rely on documents from the Central Bank of Brazil. The Court should note that the Higgins parties never had any communication or correspondence with the Central Bank of Brazil. Apparently Procapui had to report and file certain information with the Central Bank of Brazil. The Central Bank has apparently compiled some reports based on what they were told by Procapui. Apparently, also, the Central Bank thinks that, based on what it learned from Procapui, Higgins owes Procapui money. If so, that is because that's what Procapui told the Central Bank. In other words, Procapui gives incorrect or partial information to the Central Bank of Brazil and then attempts to use the Bank's summaries of that incorrect and incomplete information to "prove" that we did owe the money. Under our contract with Procapui, Massachusetts law, not Brazilian law was chosen as the law to be applied. There is no provision in the contract requiring Higgins to comply with any provision of Brazilian law or even to know what it required. The attempts to make us somehow responsible for what the Central Bank reported or to use those reports as proof of anything against is is the kind of frivolous non-proof which Procapui has attempted to use from the outset of this case.

10. It seems to me that all of these facts are readily ascertainable to anyone

carefully looking at them. To shoot from the hip by not only reciting them in a Court pleading but also making them part of sworn declarations, and trying to bootstrap that into a RICO treble damage claim is irresponsible. Even if Anavian were prepared to invent evidence and to falsify documents, these are all matters which counsel, with a bit of study and care, should have understood before he filed two pleadings charging us with "racketeering". The dates on the "confession", the methods used for pricing transactions, the dates when "undersize" lobster were illegal, who prepared the invoices and what purpose they served and what they did not serve in the transactions and all the other information have been known to Mr. DeMaio since at least early 2007 when discovery in the State Court action got under way. My brother, Robert and I explained much of this information in our depositions. To file a complaint in July, 2007 and, worse, an amended complaint in February, 2008 after having seen almost all our records and continuing to recite this misinformation is appalling. This lawsuit is costing our small company a great deal of money, all to try to disprove things that never happened. We ask that the Court take our motion for sanctions as a request for help in ending this awful experience.

I declare the foregoing to be true and correct under penalty of perjury.

Dated: May 6, 2008

/S/_____
THOMAS HIGGINS